UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                              CASE NO.   8:16-cr-319-SDM-LSG
                                                           8:20-cv-323-SDM-LSG

NEDAL ABU-AISH

_____

## ORDER

Nedal Abu-Aish moves under 28 U.S.C. § 2255 to vacate his convictions and sentences for conspiracy to possess with intent to distribute a mixture containing a detectable amount of XLR-11 and distribution of a substance containing a detectable amount of XLR-11, for which he is imprisoned for one-hundred-sixty-eight months.

A jury found Nedal and his brother, Fayez, guilty of the crimes (Crim. Docs. 122 and 125), and the court of appeals affirmed the convictions and sentences.  *United States v. Abu-Aish*, 758 F. App'x 798 (11th Cir. 2018).  At trial, "[t]he evidence presented indicated that Fayez and Nedal manufactured and packaged significant quantities of [XLR-11] in a clandestine lab, sold it out of trash bags on the street, and had suggested to a buyer (an undercover officer) that he should avoid being caught with the product."  *Abu-Aish*, 758 F. App'x at 800.

Nedal asserts that his attorney deficiently performed by failing to advise him that the prosecutor extended a plea offer; that the prosecutor violated *Giglio v. United States*, 405 U.S. 150 (1972), by knowingly presenting false testimony by a detective;

and that a two-level enhancement under the United States Sentencing Guidelines for possessing a firearm was erroneously imposed at sentencing.  (Docs. 1 and 2)

## INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD

"'[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between.'"  *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)).  *Strickland v. Washington*, 466 U.S. 668, 687 (1984), governs an ineffective assistance of counsel claim and places a heavy burden on a defendant:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

A defendant cannot meet his burden merely by showing that the avenue chosen by counsel proved unsuccessful.  *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992).  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.  "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."

466 U.S. at 690. *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91.

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." 466 U.S. at 691. To meet this burden, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

## DISCUSSION

### Ground One

Nedal asserts that his attorney deficiently performed by failing to advise him that the prosecutor extended a plea offer. (Doc. 1 at 4) He alleges that after trial he first learned that the prosecutor had extended an offer. (Doc. 2 at 2) Attached to his motion is a letter from the prosecutor to his attorney delivered before trial extending an offer. (Doc. 2-1) Nedal alleges that, if his attorney had timely advised him of the offer, he would have accepted the offer and pleaded guilty. (Doc. 2 at 2)

The United States submits with its response an affidavit by Nedal's attorney,

handwritten notes from the attorney's file, and a copy of the plea agreement.  In the plea agreement, the prosecutor agreed to recommend that Nedal receive a sentence within the advisory range under the Sentencing Guidelines, if Nedal pleaded guilty to the conspiracy charge.  (Doc. 26-2 at 22–37)  In the affidavit, Nedal's attorney stated that before trial he reviewed the plea agreement with Nedal.  (Doc. 13-2 at 5)  Nedal's attorney swore that Nedal rejected the offer and insisted on exercising his right to a jury trial.  (Doc. 13-2 at 5–6)  The attorney's handwritten notes confirms the discussion between the attorney and Nedal about the plea agreement.  (Doc. 13-3)  Because resolving this dispute of material fact requires a credibility determination, an earlier order granted Nedal an evidentiary hearing.  (Doc. 29)

At the evidentiary hearing, Nedal did not testify.  Nedal's attorney testified that Nedal denied that he knew that XLR-11 was a controlled substance.  (Doc. 45 at 97–98, 110)  Nedal's attorney testified that Nedal showed no interest in pleading guilty because he believed that he did not commit a crime.  (Doc. 45 at 99)  Nedal's attorney nonetheless requested a plea agreement from the prosecutor.  (Doc. 45 at 99)  On October 24, 2016, immediately after receiving the plea agreement, Nedal's attorney responded to the prosecutor by e-mail (Doc. 42-3 at 18):  "I received the plea agreement, but as of now [Nedal] intends to proceed to trial."  Nedal's attorney acknowledged that he had not spoken with Nedal about the plea agreement before sending that response.  (Doc. 45 at 135)

On October 27, 2016, Nedal's attorney met with Nedal to discuss the terms of the agreement.  (Doc. 45 at 100–02)  During the meeting, Nedal's attorney gave to

Nedal a copy of the agreement and asked Nedal's brother, Fayez, to assist as an interpreter.  (Doc. 45 at 101, 141–42)  Nedal's attorney described the conversation about the terms of the agreement as follows (Doc. 45 at 102–03):

| | |
|---|---|
| [Prosecutor:] | What specifically do you recall being discussed with Nedal Abu-Aish about the plea agreement that the United States had tendered for his consideration? |
| [Nedal's attorney:] | So, we discussed what the offer was, what he would be pleading to. We discussed possible penalties of that. We discussed, and I did an actual calculation of what I believed his guideline range would be, if he accepted the plea, which included acceptance. And then there [were] also the additional terms in the plea agreement we went through, including appellate waivers, cooperation, and the standard language, fines, that sort of thing. |
| | . . . |
| [Prosecutor:] | Was this conversation repeated when it was a joint meeting involving [Fayez's attorney] as well? |
| [Nedal's attorney:] | It was, because we — I know we discussed it again, because this was actually the first — the first case that I had represented a co-defendant with [Fayez's attorney]. And I specifically recall [Fayez's attorney] has a unique way of drawing pictures on his whiteboard in his office. So, I know we discussed this again [at] a joint meeting, because I recall him drawing pictures on his whiteboard. |

The prosecutor introduced into evidence handwritten notes by Nedal's attorney.  In a handwritten note titled "10/27/16 — Joint Meeting," Nedal's attorney wrote "Plea Agreement" and estimated a sentence under the Sentencing

Guidelines.  (Doc. 42-3 at 4)  Nedal's attorney testified that, after the learning the terms of the plea offer, Nedal rejected the offer because Nedal believed that he did not commit a crime.  (Doc. 45 at 106)  Also, Nedal refused to sign a letter addressed to the prosecutor confirming his rejection of the offer.  (Doc. 45 at 112)

In another handwritten note titled "10/28/16 — Meeting at [the office of Fayez's Attorney]," Nedal's attorney wrote the letters "P/A," "reviewed the facts," and "G/L still not acceptable."  (Doc. 42-3 at 13)  Nedal's attorney testified that, during this meeting, he reviewed with Nedal the plea agreement and the factual basis for the plea, and Nedal rejected the offer because the estimated sentence under the Sentencing Guidelines exceeded the prison sentence that Nedal would accept. (Doc. 45 at 109)

Nedal's attorney acknowledged that he never discussed the agreement with only Nedal and always discussed the agreement with the assistance of Fayez as an interpreter.  (Doc. 45 at 142–43, 146)  Nedal's attorney acknowledged that, around the time of the discussion of the plea agreement, a fire destroyed a store owned by Nedal and Fayez.  (Doc. 45 at 130–31)  Nedal's attorney testified that the destruction of the store did not prevent Nedal from discussing the plea agreement with a clear mind because "it was [his] understanding at the time, [Nedal] wasn't as involved in the store" and because Nedal intelligently discussed the agreement and the evidence in the case.  (Doc. 45 at 131–33)

Nedal's attorney testified that, four months after the two meetings in October, Nedal and Fayez proposed that Nedal plead guilty only if Nedal could accept all

responsibility for the crimes and secure dismissal of the charges against Fayez. (Doc. 45 at 111)  Nedal's attorney rejected the proposal because the proposal was inconsistent with the evidence in discovery and violated the rules governing professional conduct of an attorney.  (Doc. 45 at 111)

Nedal's brother Fayez, who also moved under Section 2255 for relief and asserted that his attorney failed to inform him that the prosecutor extended a plea offer, testified.  (Doc. 1 in 8:20-cv-1280)  Fayez testified that on October 27, 2016, he met with his attorney, Nedal, and Nedal's attorney.  (Doc. 45 at 11)  Fayez denied that either attorney informed him and Nedal that the prosecutor extended a plea offer.  (Doc. 45 at 23)  Fayez denied that Nedal's attorney informed him and Nedal of an estimated sentence under the Sentencing Guidelines.  (Doc. 45 at 24–25, 31)  Also, Fayez testified that during the meeting both attorneys spoke English, Nedal did not understand English, an interpreter was not present, and Fayez assisted Nedal to the best of his ability by translating statements by the attorneys into Arabic.  (Doc. 45 at 37)  Fayez testified that, if both attorneys had informed him and Nedal that the prosecutor extended the plea offer, he and Nedal would have accepted the offer, pleaded guilty, and cooperated with the prosecutor.  (Doc. 45 at 39–40)[1]

Fayez's attorney testified that during the joint meeting he discussed the plea offer and heard Fayez translate statements into Arabic for Nedal.  (Doc. 45 at 90) Fayez's attorney testified that Nedal "clearly understood" that the weight of the

---

[1] At the evidentiary hearing, Fayez introduced into evidence an article in the Tampa Bay Times demonstrating that, on October 17, 2016, a fire destroyed the brothers' store. (Doc. 34-4 in 8:20-cv-1280)

evidence that the prosecutor intended to present at trial demonstrated guilt. (Doc. 45 at 87) Also, the parties stipulated to the admission of the affidavits by the attorneys, handwritten notes by Nedal's attorney, text messages between Nedal's attorney and Fayez's attorney, and e-mails between Nedal's attorney, Fayez's attorney, and the prosecutor. (Docs. 42 and 45 at 5–6 in 8:20-cv-323 and 34 in 8:20-cv-1280)

"[C]laims of ineffective assistance of counsel in the plea bargain context are governed by the two-part test set forth in *Strickland*." *Missouri v. Frye*, 566 U.S. 134, 140 (2012). "[A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Frye*, 566 U.S. at 145. "To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel." *Frye*, 566 U.S. at 147. "Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it . . . ." *Frye*, 566 U.S. at 147. "To establish prejudice . . ., it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." *Frye*, 566 U.S. at 147.

Nedal's attorney and Fayez's attorney testified more credibly than Fayez. The handwritten notes by Nedal's attorney (Docs. 42-1 at 14 and 42-3 at 13), a billing

statement by Fayez's attorney (Doc. 42-2 at 8), and text messages between Nedal's attorney and Fayez's attorney (Doc. 42-4 at 2) demonstrate that a joint defense meeting occurred on October 27, 2016. The handwritten notes by Nedal's attorney further demonstrate that both attorneys discussed the plea agreement with Fayez and Nedal and estimated a sentence under the Sentencing Guidelines. (Doc. 42-1 at 14) The testimony by Nedal's attorney and Fayez's attorney, supported by these documents, credibly demonstrates that Nedal's attorney communicated the plea offer to Nedal.

Also, Nedal's attorney credibly testified that Nedal refused to accept the plea offer. In a note dated September 15, 2015, Nedal's attorney wrote "would be hard to plead — thinking trial," which demonstrates that, even before the prosecutor extended an offer, Nedal did not want to plead guilty. (Doc. 42-3 at 7) In the note dated October 28, 2016, Nedal's attorney wrote "P/A" and "G/L still not agreeable" (Doc. 42-3 at 13), which demonstrates that Nedal rejected the offer because the estimated sentence under the Sentencing Guidelines exceeded the prison sentence that Nedal would accept. (Doc. 45 at 109) Also, in a note submitted at sentencing, Nedal wrote (Doc. 42-3 at 22): "During my life, I have never committed any crimes, any violations, and have never disrespected the law." Even after the jury found Nedal guilty, Nedal persisted in his belief that he was innocent. The testimony by Nedal's attorney, supported by these documents, demonstrates that Nedal refused to accept the plea offer.

Lastly, *Strickland* places the burden on Nedal to demonstrate deficient

performance and prejudice.  *Strickland*, 466 U.S. at 687.  During the evidentiary

hearing, the prosecutor moved for a summary denial of Nedal's claim because Nedal

did not testify.  (Doc. 45 at 92–93)  Nedal's post-conviction counsel responded

(Doc. 45 at 94):  "I don't think that he is required to take the stand and speak.  We've

spoken about it, and he's elected not to."  (Doc. 45 at 94)  An adverse inference

drawn from Nedal's decision not to testify at the evidentiary hearing in this civil

action supports the conclusion that Nedal's claim is incredible.  2 R. Mosteller, *et al.*,

McCormick on Evidence § 264 (9th ed. 2025) ("When it would be natural under the

circumstances for a party to call a particular witness, or to take the stand as a witness

in a civil case, or to produce documents or other objects in his or her possession as

evidence and the party fails to do so, tradition has allowed the adversary to use this

failure as the basis for invoking an adverse inference.").  *Latif v. Obama*, 677 F.3d

1175, 1193 (D.C. Cir. 2011) ("Although the district court's factual findings may be

supported by documentary evidence no less than by oral testimony, a civil party's

decision not to testify may support an adverse inference about his credibility.")

(citations omitted).

     Even without the adverse inference, Nedal failed to demonstrate both deficient

performance and prejudice under *Strickland*.  Consequently, Nedal's claim is

meritless.  *Frye*, 566 U.S. at 145, 147.  Ground One is denied.

**Ground Two**

     Nedal asserts that the prosecutor violated *Giglio* by knowingly presenting false

testimony by a detective.  (Doc. 1 at 5)  At trial on direct examination, the detective

testified that he purchased from Nedal a large quantity of synthetic cannabinoids

(Crim. Doc. 149 at 116–17):

> [Detective:]    About this same time [the store clerk] came from the back room with a grocery bag full of packets of synthetic cannabinoids. [The store clerk] and I went to the back corner of the store, you know, out of eyesight of everybody that would be coming and going from the store, you know, kind of hide what we were doing. Back there, I exchanged four hundred dollars for the packets of synthetic cannabinoids. He explained to me, you know, the types that he had put in the bag and, you know, various name brands [ ] of the synthetic cannabinoids.
>
> . . .
>
> I returned to the front of the store, where [Nedal] was still located, and he took the bag from me and went back towards the back of the room again, placing it inside a second plastic bag to conceal the contents, because you could see through the one bag. After that, I — you know, maybe a little bit more small talk about something unrelated, and I left the store with the synthetic cannabinoids.
>
> [Prosecutor:]    Did either of these two individuals ring this sale up on the cash register in the store?
>
> [Detective:]    No, sir.
>
> [Prosecutor:]    Did they give you any form of receipt for your purchase?
>
> [Detective:]    No, sir.

On cross-examination, the detective testified that he did not know whether

Nedal later placed in the cash register the money that the detective gave

Nedal for the purchase of the synthetic cannabinoids (Crim. Doc. 149 at 151–52):

| | |
|---|---|
| [Fayez's attorney:] | Let me go back to this. After you made your purchase back in this room — area over here — |
| [Detective:] | Yes, sir. |
| [Fayez's attorney:] | — did you go out this particular way or did you come around and go this way? |
| [Detective:] | The second option, I walked down the path where this gentleman with the hat is standing. |
| [Fayez's attorney:] | And you walked on out of the store? |
| [Detective:] | Yes, sir. |
| [Fayez's attorney:] | You didn't stop anywhere along the way? |
| [Detective:] | I may have stopped, like I said, [to] make small talk. But, as far as stopping for a significant amount of time, or for anything relevant to the investigation, I don't believe so. |
| [Fayez's attorney:] | And you don't know if — you made the purchase back here, but you don't know if that money was ever recorded in the register or not, correct? |
| [Detective:] | I made the purchase to the left. I don't know what they did with the money after I left, no, sir. |
| [Fayez's attorney:] | So, it certainly could have been put into the register, correct? |
| [Detective:] | It may have been. I can't tell you if it was or not. I mean, if we're playing a game of possibilities, yes, it was possible. |

Also, on direct examination, the detective testified that Nedal warned the detective to "be safe and be cautious" and to "not get caught" with the synthetic

cannabinoids (Crim. Doc. 149 at 116):

> [Detective:] And during this discussion, you know, we discussed the price break, and if I was to purchase "X" amount of bags, how low the prices would go. During the course of this conversation, he explained, you know, to be safe and be cautious, and to not get caught with, you know, the items that I was purchasing. And I explained to him that wouldn't be an issue, that, you know, my father and I had a convenience store up in Brooksville, and that I wanted to see how, you know, selling this product — you know, how well I could with it before I came back to purchase additional quantities.

On cross-examination, the detective denied that during the conversation Nedal told the detective, "Don't get caught" (Crim. Doc. 149 at 156–57):

> [Fayez's attorney:] You mentioned, while you were testifying, that — you [ ] — used the term, "Don't get caught." Do you remember using that term?
>
> [Detective:] Yes, sir.
>
> [Fayez's attorney:] That term was never utilized by Nedal, was it?
>
> [Detective:] No, sir.
>
> [Fayez's attorney:] That's what you told the jury?
>
> [Detective:] Yes, sir.
>
> [Fayez's attorney:] "Don't get caught." But he never said that, did he?
>
> [Detective:] No, sir.

Nedal contends that the detective's testimony on cross-examination demonstrates that the prosecutor knowingly presented false testimony by the

detective on direct examination.  (Doc. 2 at 4)  Nedal contends that the detective falsely testified that neither Nedal nor the store clerk "r[ang] th[e] sale up on the cash register in the store" and that Nedal told the detective, "Don't get caught."  (Doc. 2 at 4–5)

The United States argues that the claim is procedurally defaulted because Nedal could have raised the issue on direct appeal.  (Doc. 13 at 9)  For judicial economy, review will proceed to the merits of the claim.  *Dallas v. Warden*, 964 F.3d 1285, 1307 (11th Cir. 2020) ("As we have said many times and as the Supreme Court has held, a federal court may skip over the procedural default analysis if a claim would fail on the merits in any event.").

"'*Giglio* error, a species of *Brady* error, occurs when [ ] undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury.'"  *United States v. Stein*, 846 F.3d 1135, 1147 (11th Cir. 2017) (citation omitted).  "'To prevail on a *Giglio* claim, a [defendant] must establish that (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, *i.e.*, that there is any reasonable likelihood that the false testimony could have affected the judgment.'"  *Stein*, 846 F.3d at 1147 (citation omitted).

Because Nedal's attorney successfully cross-examined the detective at trial about the alleged misrepresentations, Nedal fails to demonstrate that the prosecutor suppressed any evidence.  *Hammond v. Hall*, 586 F.3d 1289, 1309 (11th Cir. 2009)

("The trial transcript shows there was disclosure; there was no suppression.  Because information about the payments to Weldon was not suppressed, Hammond's related *Giglio* claim based on Weldon's alleged lies about the amount of the payments to her [ ] fails.").

On direct examination, the detective testified that neither Nedal nor the store clerk "[rang the] sale up on the cash register in the store," or "[gave] any form of receipt for [the] purchase."  (Crim. Doc. 149 at 117)  On cross examination, the detective testified that he did not "know what they did with the money after [he] left," and that either Nedal or the store clerk "possibly" put the money into the register.  (Crim. Doc. 149 at 151–52)  Because the detective's testimony on cross-examination did not contradict his testimony on direct examination, Nedal fails to demonstrate that the detective falsely testified about the money.  *Maharaj v. Sec'y, Dep't Corrs.*, 432 F.3d 1292, 1313 (11th Cir. 2005) ("In the *Giglio* context, the suggestion that a statement may have been false is simply insufficient; the defendant must conclusively show that the statement was actually false.").

Lastly, because Nedal's attorney successfully cross-examined the detective and argued in closing that the alleged misrepresentations demonstrated the detective's lack of credibility (Crim. Doc. 150 at 139, 147–48), any error does not substantially and injuriously affect the jury's verdict.  *Phillips v. United States*, 849 F.3d 988, 993 (11th Cir. 2017) ("When a petitioner raises a *Giglio* error on collateral review, habeas relief will be granted only if the [c]onstitutional violation at the trial level resulted in actual prejudice to the petitioner.  The alleged error must have had a substantial and

injurious effect or influence in determining the jury's verdict.") (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)) (internal quotations omitted).  Ground Two is denied.

**Ground Three**

Nedal asserts that a two-level enhancement under the United States Sentencing Guidelines for possessing a firearm was erroneously imposed at sentencing.  (Docs. 1 at 6 and 2 at 12–13)  He contends that he lawfully kept a firearm in a locked safe and that law enforcement returned the firearm to him before the grand jury indicted him.  (Docs. 1 at 6 and 2 at 12–13)

The United States argues that the claim is procedurally defaulted because Nedal could have raised the issue on direct appeal.  (Doc. 13 at 9)  For judicial economy, review will proceed to the merits of the claim.  *Dallas*, 964 F.3d at 1307.

Nedal's claim based on a misapplication of the Sentencing Guidelines is not cognizable on collateral review.  *Spencer v. United States*, 773 F.3d 1132, 1138 (11th Cir. 2014) ("When a prisoner [ ] alleges that his 'sentence was imposed in violation of the . . . laws of the United States . . . or is otherwise subject to collateral attack,' a district court lacks the authority to review the alleged error 'unless the claimed error constitute[s] a fundamental defect which inherently results in a complete miscarriage of justice.'") (citations omitted).

The jury found Nedal guilty of conspiracy to possess with intent to distribute XLR-11 and two counts of distribution of XLR-11.  (Crim. Doc. 125)  Nedal faced a statutory maximum sentence of twenty years in prison for each conviction and

received a sentence of 168 months in prison.  (Crim. Doc. 125)  18 U.S.C. § 3584(a)

(2014).  21 U.S.C. § 841(b)(1)(C) (2014).  Because Nedal received a sentence below

the statutory maximum and because he does not assert a miscarriage of justice based

on actual innocence, his claim on collateral review is meritless.  *Spencer*, 773 F.3d at

1139 ("When a federal prisoner, sentenced below the statutory maximum, complains

of a sentencing error and does not prove either actual innocence of his crime or the

vacatur of a prior conviction, the prisoner cannot satisfy the demanding standard that

a sentencing error resulted in a complete miscarriage of justice.").

Also, at sentencing, an objection to the two-level enhancement for possessing

the firearm was overruled as follows (Crim. Doc. 154 at 14–17):

> [Nedal's attorney:]  Judge, the next objection would be to paragraph 25, which includes a two-level increase pursuant to Section 2D1.1(b)(1) for the [possession] of a firearm. Specifically, I would object based on Application Note 11(a) of this guideline, which says it's applicable unless it's clearly improbable that the weapon was connected with the offense.
>
> The firearm we're speaking of was located in a locked safe, which was located in Mr. Nedal Abu-Aish's bedroom. I don't believe there was any other contraband located in that safe along with the firearm that would show a connection to the instant offense. Additionally, I don't believe there was any evidence that the firearm was ever present at any time during any of the conduct which gives rise to the incident offense.
>
> The firearm was possessed lawfully by Mr. Nedal Abu-Aish for personal protection as he was the victim of a prior robbery where he suffered a gunshot

wound, which is documented at paragraph 59 in the PSR. So, he had the firearm for personal protection, and it was not for purposes to be used in connection with the instant offense. So, I would object to the two-level increase for the firearm.

[Judge:]    Mr. Preston?

[Prosecutor:]    The firearm was located in a safe with approximately $93,000.00, which the government would suggest, based on the nature of the activities that were taking place, was funds from the distribution of controlled substances. Other activities also took place in or around the residence, as evidenced by the seizure of the packaging materials, some finished packaged product, and the drug ledger that was found in the residence. We also know that the residence was used on at least one occasion to confront Rami Rabboh, after the burglary of the storage unit.

So, this defendant conducted drug-related activities out of the home, where he possessed the firearm[.] [T]herefore, it's his burden to show it's clearly improbable that it was related to any of his drug activity and, as a tool of the trade, the defendant has failed to meet that burden today.

[Judge:]    Well, as I said in the co-defendant's case, this is a pretty serious uphill climb for the defendant on this particular issue. Of course, the United States or the facts need not establish that the weapon was there solely for the purpose of expediting the — defending or implementing the purposes of the conspiracy, but simply that it was there in connection with it. It's often the case that these events occur in neighbor[hoods] where someone might reasonably have a firearm for self-defense, but that does not mean that that firearm is

- 18 -

not there for the purposes of defending, among other things, the inventory, the proceeds, or the participants in the conspiracy.

So, under the circumstances here, it strikes me that it is not clearly improbable that this firearm was present in connection with the conspiracy. The objection is overruled.

[Nedal's attorney:]    Judge, can I raise one objection to that?

[Judge:]    Yes, sir.

[Nedal's attorney:]    Based on the representation that the $93,000.00, was funds from the distribution of the contraband, I don't believe there was any evidence to connect those funds to the distribution of the contraband.

[Judge:]    Understood. Do you want to respond to that, Mr. Preston?

[Prosecutor:]    I agree that there was no specific evidence relating those particular funds to the distribution of the narcotics. However, the circumstances strongly suggest that there was a huge cash business, and these were drug proceeds.

[Judge:]    If that was — I persist in my ruling I guess, is what I should say.

"The Sentencing Guidelines provide for a two-level sentence enhancement '[i]f a dangerous weapon (including a firearm) was possessed[.]'" *United States v. Graham*, 123 F.4th 1197, 1288 (11th Cir. 2024) (quoting §2D1.1(b)(1), U.S.S.G.). "The commentary for Section 2D1.1(b)(1) provides that '[t]he enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.'" *Graham*, 123 F.4th at 1288 (quoting §2D1.1(b)(1)

n.11(A), U.S.S.G.).  "The government bears the initial burden of showing by a preponderance of the evidence that a firearm was present at the site of the charged conduct or that the defendant possessed a firearm during conduct related to the offense of conviction."  *Graham*, 123 F.4th at 1288.  "If the government meets its initial burden, 'the evidentiary burden shifts to the defendant, who must demonstrate that a connection between the weapon and the offense was clearly improbable.'" *Graham*, 123 F.4th at 1288 (citation omitted).

When executing a search warrant at Nedal's home, police found the firearm and the money in the safe, and other items in the home, including small packages of synthetic cannabinoids and a ledger with a list of different brands of synthetic cannabinoids and quantities of different sized packages.  (Crim. Docs. 111 at 6 and 149 at 140–41)  Because the prosecutor demonstrated that Nedal kept the firearm at his home where he engaged in the charged criminal conduct, and Nedal failed to demonstrate that a connection between the firearm and the offenses was "clearly improbable," the enhancement for possessing the firearm applied.  *Graham*, 123 F.4th at 1288 ("Mr. Walker argues that Sargeant Kelly's testimony is insufficient to show either that he possessed the firearm during the transaction or that he was the person who sold the drugs.  But it is enough that the firearms were present at the site of the charged conduct.").  Ground Three is denied.

Nedal's motion under Section 2255 to vacate, set aside, or correct his sentence is **DENIED**.  The clerk is directed to enter a judgment against Nedal, close this case, and enter a copy of this order in 8:16-cr-319-SDM-LSG.

Nedal moves for a conference to determine the status of these proceedings. (Doc. 44) Because Nedal's motion under Section 2255 for relief is denied, the motion (Doc. 44) for a conference is **DENIED** as moot.

**DENIAL OF CERTIFICATE OF APPEALABILITY
AND LEAVE TO APPEAL *IN FORMA PAUPERIS***

Because Nedal fails to show that reasonable jurists would debate either the merits of the claims or the procedural issues, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000). To appeal *in forma pauperis,* Nedal must obtain permission from the court of appeals.

ORDERED in Tampa, Florida, on March 31, 2025.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE